**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CENTER FOR BIOLOGICAL
DIVERSITY; SAVE THE SCENIC
SANTA RITAS; ARIZONA MINING
REFORM COALITION; GRAND
CANYON CHAPTER OF THE
SIERRA CLUB; TOHONO
O'ODHAM NATION; HOPI TRIBE;
PASCUA YAQUI TRIBE OF
ARIZONA, named as Pascua
Yaqui Tribe,
        *Plaintiffs-Appellees*,

v.

UNITED STATES FISH AND
WILDLIFE SERVICE; UNITED
STATES FOREST SERVICE;
UNITED STATES OF AMERICA;
KURT DAVIS, Acting Supervisor
of the Coronado National Forest;
CALVIN JOYNER, Regional
Forester; RANDY MOORE, Chief
of the U.S. Forest Service;
THOMAS J. VILSACK, U.S.
Secretary of Agriculture,
        *Defendants-Appellants*,

and

No. 19-17585

D.C. Nos.
4:17-cv-00475-JAS
4:17-cv-00576-JAS
4:18-cv-00189-JAS

ROSEMONT COPPER COMPANY,
    *Intervenor-Defendant.*

CENTER FOR BIOLOGICAL
DIVERSITY; SAVE THE SCENIC
SANTA RITAS; ARIZONA MINING
REFORM COALITION; GRAND
CANYON CHAPTER OF THE
SIERRA CLUB; TOHONO
O'ODHAM NATION; HOPI TRIBE;
PASCUA YAQUI TRIBE OF
ARIZONA, named as Pascua
Yaqui Tribe,
            *Plaintiffs-Appellees*,

            v.

UNITED STATES FISH AND
WILDLIFE SERVICE; UNITED
STATES FOREST SERVICE;
UNITED STATES OF AMERICA;
KURT DAVIS, Acting Supervisor
of the Coronado National Forest;
CALVIN JOYNER, Regional
Forester; RANDY MOORE, Chief
of the U.S. Forest Service;
THOMAS J. VILSACK, U.S.
Secretary of Agriculture,
            *Defendants*,

            and

No. 19-17586

D.C. Nos.
4:17-cv-00475-JAS
4:17-cv-00576-JAS
4:18-cv-00189-JAS


OPINION

ROSEMONT COPPER COMPANY,
*Intervenor-Defendant-Appellant.*

Appeal from the United States District Court
for the District of Arizona
James Alan Soto, District Judge, Presiding

Argued and Submitted February 1, 2021
Phoenix, Arizona

Filed May 12, 2022

Before:  William A. Fletcher, Eric D. Miller, and
Danielle J. Forrest, Circuit Judges.

Opinion by Judge W. Fletcher;
Dissent by Judge Forrest

## SUMMARY[*]

### Mining Law

The panel affirmed the district court's judgment that the U.S. Fish and Wildlife Service acted arbitrarily and capriciously in approving the entirety of Rosemont Copper Company's mining plan of operations ("MPO") in its Final Environmental Statement and Record of Decision.

Rosemont seeks to dig a large open-pit copper mine in the Santa Rita mountains south of Tucson, Arizona. Rosemont owns valid mining rights on the National Forest land where it would dig its proposed pit mine. The Mining Law of 1872 allows mining companies to occupy federal land on which valuable minerals have been found, as well as non-mineral federal land for mill sites, essentially free of charge. The Service has promulgated regulations that govern surface uses of forest land relating to mining. 36 C.F.R. Part 228, Subpart A. Rosemont asked the Forest Service to authorize it to permanently occupy with its waste rock 2,447 acres of additional National Forest land on which it does not have valid mining rights.

The Service approved the MPO on two separate grounds. First, the Service concluded that Section 612 of the Surface Resources and Multiple Use Act of 1955 gave Rosemont the right to dump its waste rock on open National Forest land, without regard to whether it has any mining rights on that land. Second, the Service assumed that under the Mining

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Law, Rosemont had valid mining claims on the 2,447 acres it proposed to occupy with its waste rock. The district court held that neither ground supported the Service's approval of Rosemont's MPO.

The panel agreed with the district court's holding that Section 612 of the Multiple Use Act granted no rights beyond those granted by the Mining Law. In fact, the Government abandoned on appeal any argument that Section 612 supported the Service's decision. The panel also agreed with the district court's holding that the Service had no basis for assuming that Rosemont's mining claims were valid under the Mining Law. For different reasons, the panel also agreed with the district court's holding that the claims were invalid. The panel held that the claims were invalid because no valuable minerals had been found on the claims. The panel remanded to the Service for further proceedings as it deems important, informed by the Government's concession that Section 612 grants no rights beyond those granted by the Mining Law, and by the panel's holding that Rosemont's mining claims on the 2,447 acres were invalid under the Mining Law. The panel noted that it did not know whether the Service would have decided that Part 228A regulations were applicable to Rosemont's proposal to occupy invalid claims with its waste rock, and, if applicable, whether the Service would have construed those regulations to allow such occupancy. These are decisions that must be made in the first instance by the Service.

Dissenting, Judge Forrest would hold that the regulations that the Service adopted to fill in the gaps left by the Mining Law established that: (1) the lawfulness of waste-rock disposal did not depend on whether the mine operator had valid mining claims to the disposal area; and (2) it was not

arbitrary and capricious for the Service to apply the Part 228A regulations to Rosemont's proposed deposit of waste rock because on their express terms they applied to this activity as a matter of law. She would reverse and remand for the district court to assess the Service's decision under Part 228A.

**COUNSEL**

Amelia G. Yowell (argued), Andrew C. Mergen, Andrew A. Smith, and Sommer H. Engels, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jonathan D. Brightbill, Principal Deputy Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Stephen A. Vaden, General Counsel, United States Department of Agriculture; Washington, D.C.; for Defendants-Appellants.

Julian W. Poon (argued), Theodore J. Boutrous Jr., Bradley J. Hamburger, and Virginia L. Smith, Gibson Dunn & Crutcher LLP, Los Angeles, California; Katherine C. Yarger, Gibson Dunn & Crutcher LLP, Denver, Colorado; Norman D. James, Fennemore Craig P.C., Phoenix, Arizona; for Intervenor-Defendant-Appellant.

Heidi McIntosh (argued), Stuart Gillespie, and Caitlin Miller, Earthjustice, Denver, Colorado, for Plaintiffs-Appellees Tohono O'odham Nation, Hopi Tribe, and Pascua Yaqui Tribe.

Roger Flynn (argued) and Jeffrey C. Parsons, Western Mining Action Project, Lyons, Colorado; Marc D. Fink, Center for Biological Diversity, Duluth, Minnesota; Allison

N. Melton, Center for Biological Diversity, Crested Butte, Colorado; for Plaintiffs-Appellees Center for Biological Diversity, Save the Scenic Santa Ritas, Arizona Mining Reform Coalition, and Grand Canyon Chapter of the Sierra Club.

Ronald W. Opsahl, Opsahl Law Office LLC, Lakewood, Colorado, for Amicus Curiae Southern Arizona Business Coalition.

R. Timothy McCrum and Elizabeth B. Dawson, Crowell & Moring LLP, Washington, D.C.; Katie Sweeney, Executive Vice President and General Counsel, National Mining Association, Washington, D.C.; for Amici Curiae National Mining Association (including Member State Mining Associations) and Chamber of Commerce of the United States of America.

Alison C. Hunter, Holland & Hart LLP, Boise, Idaho; Laura K. Granier, Holland & Hart LLP, Reno, Nevada; for Amicus Curiae American Exploration and Mining Association.

Matthew N. Newman, Native American Rights Fund, Anchorage, Alaska; David L. Gover, Native American Rights Fund, Boulder, Colorado; Joel West Williams, Native American Rights Fund, Washington, D.C.; for Amicus Curiae National Congress of American Indians, Inter-Tribal Association of Arizona, Association of American Indian Affairs, and Two Federally Recognized Tribal Nations.

Derrick Beetso, National Congress of American Indians, Washington, D.C., for Amicus Curiae National Congress of American Indians.

Lori Potter and Sarah C. Judkins, Kaplan Kirsch & Rockwell LLP, Denver, Colorado, for Amici Curiae Law Professors.

Regina L. Nassen and Victoria Buchinger, Deputy County Attorneys, Civil Division, Pima County Attorney's Office, Tucson, Arizona, for Amici Curiae Pima County and Pima County Regional Flood Control District.

**OPINION**

W. FLETCHER, Circuit Judge:

Rosemont Copper Company seeks to dig a large open-pit copper mine in the Santa Rita Mountains just south of Tucson, Arizona. The proposed mining operation would be partly within the boundaries of the Coronado National Forest. The pit would be 3,000 feet deep and 6,500 feet wide, and would produce over five billion pounds of copper. No one disputes that Rosemont has valid mining rights on the land where the pit would be located.

Pit mining produces large amounts of waste rock. Rosemont proposes to dump 1.9 billion tons of waste rock near its pit, on 2,447 acres of National Forest land. The pit itself will occupy just over 950 acres. When operations cease after twenty to twenty-five years, waste rock on the 2,447 acres would be 700 feet deep and would occupy the land in perpetuity.

The United States Forest Service ("the Service") approved Rosemont's mining plan of operations ("MPO") on two separate grounds. First, the Service concluded that Section 612 of the Surface Resources and Multiple Use Act

of 1955 ("Multiple Use Act") gives Rosemont the right to dump its waste rock on open National Forest land, without regard to whether it has any mining rights on that land, as a "use[] reasonably incident" to its operations at the mine pit. Second, the Service assumed that under the Mining Law of 1872 ("Mining Law") Rosemont has valid mining claims on the 2,447 acres it proposes to occupy with its waste rock. Based on that assumption, the Service concluded that Rosemont has the right to occupy those claims.

Relying on these two grounds, the Service approved Rosemont's MPO, concluding under Section 612 of the Multiple Use Act and under the Mining Act that it had only the authority contained in its Part 228A regulations to regulate Rosemont's proposal to occupy its mining claims with its waste rock. The Service suggested that if it had greater regulatory authority than that provided by its Part 228A regulations, it might not have approved the MPO in its current form.

The district court held that neither ground supports the Forest Service's approval of Rosemont's MPO. It held that Section 612 grants no rights beyond those granted by the Mining Law. It further held that there is no basis for the Service's assumption that Rosemont's mining claims are valid under the Mining Law. Indeed, based on a conclusion that there are no valuable minerals on the claims, the court held that the claims are actually invalid. The district court therefore concluded that the Service acted arbitrarily and capriciously in approving the entirety of Rosemont's MPO in its Final Environmental Impact Statement ("FEIS") and Record of Decision ("ROD").

We affirm the district court. We agree with its holding that Section 612 grants no rights beyond those granted by the Mining Law. Indeed, the Government has abandoned on appeal any argument that Section 612 supports the Service's decision. We also agree with its holding that the Service had no basis for assuming that Rosemont's mining claims are valid under the Mining Law. Although our reasoning differs slightly from that of the district court, we also agree with the court's holding that the claims are invalid. We do not rely, as the district court did, on a conclusion that no valuable minerals exist on the claims. Rather, we hold that the claims are invalid because no valuable minerals have been found on the claims.

We do not know what the Service would have done if it had understood that Section 612 grants no rights beyond those granted by the Mining Law and that Rosemont's mining claims are invalid under the Mining Law. In particular, we do not know whether the Service would have decided that Part 228A regulations are applicable to Rosemont's proposal to occupy invalid claims with its waste rock, and, if applicable, whether the Service would have construed those regulations to allow such occupancy. These are decisions that must be made in the first instance by the Service rather than by our court. We therefore remand to the Service for such further proceedings as it deems appropriate, informed by the Government's concession that Section 612 grants no rights beyond those granted by the Mining Law, and by our holding that Rosemont's mining claims on the 2,447 acres are invalid under the Mining Law.

I. Statutes and Associated Regulations

We begin with a brief summary of the interlocking statutes and regulations relevant to this appeal.

(A) *The Mining Law of 1872*:  The Mining Law of 1872 (the "Mining Law") gives to United States citizens free of charge, except for small filing and other fees, mining rights upon discovery of "valuable minerals" on federal land.  *See* Mining Law of 1872, ch. 152, 17 Stat. 91 (codified as amended at 30 U.S.C. §§ 21 to 54).  When first enacted, the Mining Law was exceedingly broad, encompassing almost all federal land in the American West, and encompassing a wide range of valuable minerals.

In succeeding years, the scope of the Mining Law has been substantially reduced.  First, Congress, the President, and the Department of the Interior have withdrawn many areas of federal land from availability under the Mining Law.  *See, e.g.*, Act of March 1, 1872, ch. 24, § 1, 17 Stat. 32 (codified at 16 U.S.C. § 21) (withdrawing Yellowstone National Park); *United States v. Midwest Oil Co.*, 236 U.S. 459, 480–81 (1915) (upholding President Taft's withdrawal of three million acres for petroleum extraction); *Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 866–70 (9th Cir. 2017) (upholding the Department of the Interior's withdrawal of one million acres for uranium mining).  Second, Congress has declared that some mineral deposits are not "valuable mineral deposits" within the meaning of the Mining Law.  *See, e.g.*, Surface Resources and Multiple Use Act of 1955, ch. 375, § 3, 69 Stat. 368 (codified at 30 U.S.C. § 611) (sand, gravel, and pumice are not valuable minerals under the Mining Law).  Third, later statutes—particularly environmental laws such as the National Environmental Policy Act ("NEPA") and the

Endangered Species Act ("ESA")—have restricted the manner in which miners with valid claims under the Mining Law can perform their mining operations. *See* John Leshy, *The Mining Law: A Study in Perpetual Motion* 25–48 (1987).

However, 150 years after its enactment, the Mining Law remains in effect for much federal land and for many minerals, including copper. Within the scope of its operation, the Mining Law continues to be a source of wealth—sometimes great wealth—for those who discover valuable minerals on federal land.

The Mining Law grants, nearly free of charge, two kinds of legal interests on federal land: (1) mining claims and (2) mill sites.

(1) *Mining claims*: The Mining Law allows United States citizens to prospect for valuable minerals on federal land. A miner who finds valuable minerals may "locate" (or "stake") a claim and thereby obtain an "unpatented mining claim." 30 U.S.C. § 22. A valid unpatented claim gives the miner the right to "occupy" the claim and to mine the minerals free of charge. Until 1994, a miner could "patent" a claim, thereby obtaining ownership of the surface area as well as the mineral rights. *See R.T. Vanderbilt Co. v. Babbitt*, 113 F.3d 1061, 1064 (9th Cir. 1997). We are concerned here only with unpatented mining claims. For ease of reading, we refer to Rosemont's upatented mining claims at issue in this case simply as "mining claims."

Section 22 of the Mining Law provides that public land shall be "free and open" for citizens to "explor[e]" for "valuable mineral deposits." 30 U.S.C. § 22. Section 22 also allows a citizen to occupy land temporarily while prospecting

for valuable minerals.  *See Union Oil Co. of Cal. v. Smith*, 249 U.S. 337, 346 (1919) ("[A]s a practical matter, exploration must precede the discovery of minerals, and some occupation of the land ordinarily is necessary for adequate and systematic exploration.").  A "valuable mineral deposit" is "mineral [that] can be 'extracted, removed and marketed at a profit.'"  *United States v. Coleman*, 390 U.S. 599, 600 (1968).  If a valuable mineral deposit has been discovered on a claim, a miner may occupy the claim for mining purposes. In the absence of a discovery of a valuable mineral deposit, Section 22 gives a miner no right to occupy the claim beyond the temporary occupancy necessary for exploration.

Once a miner discovers a valuable mineral deposit, Sections 23 and 26 of the Mining Law allow the miner to "locate" "unpatented mining claims" on that land.  *See* 30 U.S.C. § 23 ("[N]o location of a mining claim shall be made until the discovery of the vein or lode within the limits of the claim located."); *id.* § 26 (conferring on a successful locator "the exclusive right of possession and enjoyment" of the surface and the minerals underneath).  As a practical matter, a miner is allowed to locate an unpatented claim before discovering valuable minerals.  But the claim is invalid and confers no right without a "discovery" of "valuable minerals" on the claim.  *See Cole v. Ralph*, 252 U.S. 286, 296 (1920) (mere location of the mining claim "confers no right in the absence of discovery").  The validity of a claim cannot be established by a discovery of valuable minerals nearby.  *See Waskey v. Hammer*, 223 U.S. 85, 91 (1912) ("A discovery without the limits of the claim, no matter what its proximity, does not suffice.").

If a mining claim is invalid, a miner has no right, possessory or otherwise, in connection with the land.

*Cameron v. United States*, 252 U.S. 450, 460 (1920) (stating that "no right arises from an invalid claim of any kind" because the contrary holding would "work an unlawful private appropriation in derogation of the rights of the public"); *accord Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 337 (1963). The rule that discovery is "a prerequisite to the location of a claim" is designed to "prevent the location of land not found to be mineral." *Waskey*, 223 U.S. at 90–91. The Bureau of Land Management ("BLM"), within the Department of the Interior, has the authority to make final determinations, through adjudicative proceedings, whether valuable minerals have been found on a mining claim and, thus, whether the claim is valid. *See Best*, 371 U.S. at 336; *Clouser v. Espy*, 42 F.3d 1522, 1525 (9th Cir. 1994).

(2) *Mill sites*: The Mining Law allows the owner of a valid mining claim on land containing valuable minerals to obtain possessory rights to other land for use as a "mill site." Mill-site land is "nonmineral land not contiguous to the vein or lode [that] is used or occupied by the proprietor . . . for mining or milling purposes." 30 U.S.C. § 42(a). That is, land under a mill site need not contain valuable minerals. Under BLM regulations, valid uses of a mill site include "[t]ailings ponds and leach pads," "[r]ock and soil dumps," and "[a]ny other use that is reasonably incident to mine development and operation." 43 C.F.R. § 3832.34(a)(3), (a)(4), (a)(6). Though the Mining Law limits individual mill sites to five acres, current regulations, unchallenged in this suit, allow owners of mining claims to stake multiple mill sites if "reasonably necessary" for their mining operations. *Id.* § 3832.32.

(B) *Later federal statutes*:

(1) *The Organic Act of 1897*: The Organic Act of 1897 (the "Organic Act") requires the Service to "protect[] against . . . depredations upon the public forests and national forests." 16 U.S.C. § 551. The Organic Act allows the continuation of mining activities authorized by federal mining laws, including the Mining Law: "[A]ny mineral lands in any national forest . . . subject to entry under the existing mining laws . . . shall continue to be subject to such location and entry. . . ." *Id.* § 482. The Organic Act does not "prohibit any person from entering upon such national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof." *Id.* § 478.

(2) *The Surface Resources and Multiple Use Act of 1955*: The Surface Resources and Multiple Use Act of 1955 (the "Multiple Use Act") limits rights granted under the Mining Law. *See Converse v. Udall*, 399 F.2d 616, 617–18 (9th Cir. 1968). First, the Multiple Use Act forbids use of an unpatented mining claim by a claim owner "for any purposes *other than* prospecting, mining or processing operations and uses reasonably incident thereto." 30 U.S.C. § 612(a) (emphasis added). For example, mining claim owners have no right under the Mining Law to use their claims for non-mining purposes such as timber harvesting or recreational fishing. *United States v. Shumway*, 199 F.3d 1093, 1101 (9th Cir. 1999). Second, the Multiple Use Act authorizes non-mining activities by third parties on the surface of mining claims, provided those activities do not "endanger or materially interfere with . . . mining or processing operations or uses reasonably incident thereto." 30 U.S.C. § 612(b). Section 612 of the Act does not expand the rights of owners

of mining claims.  To the extent it effects any change, Section 612 reduces those rights by forbidding an owner from using the claim for non-mining purposes and by making the owner's surface rights non-exclusive.

(C)  *Regulations*:

(1)  *Part 228A*:  In 1974, the Forest Service promulgated Part 228A regulations under the Organic Act to implement the Mining Law.  *See* National Forests Surface Use Under U.S. Mining Laws, 39 Fed. Reg. 31,317 (Aug. 28, 1974). Part 228A regulations apply to uses of National Forest lands "in connection with *operations authorized by the United States mining laws* (30 U.S.C. 21–54)."  36 C.F.R. § 228.1 (emphasis added).  Part 228A regulations require the owner of a valid mining claim to submit a mining plan of operations ("MPO") for approval by the Service whenever any mining operation is "likely [to] cause significant disturbance of surface resources."  *Id.* § 228.4(a)(4).  Operations are defined to include "[a]ll functions, work, and activities in connection with . . . mining . . . regardless of whether said operations take place on or off mining claims."  *Id.* § 228.3(a).

(2) *Part 251*:  In 1980, the Forest Service promulgated Part 251 Special Use regulations under its Organic Act.  *See* National Forest System Land; Special Uses, 45 Fed. Reg. 38,324 (June 6, 1980).  Part 251 regulations apply to uses of National Forest land that is not encumbered by mining claims.  *See* 36 C.F.R. § 251.50(a) ("Scope.  All uses of National Forest System lands, improvements, and resources, except those authorized by the regulations governing . . . minerals (part 228) . . . .").  They are more protective of the environment than Part 228A regulations and generally do not

permit uses that "involve disposal of solid waste or . . . hazardous substances." 36 C.F.R. § 251.54(e)(1)(ix).

## II. Background

### A. The Proposed Rosemont Mine

In 2007, Rosemont submitted a preliminary MPO for a proposed open-pit copper mine, located partly in the Coronado National Forest. As eventually approved by the Service, the proposed pit would be 3,000 feet deep and 6,500 feet in diameter, and would cover 955 acres. The pit itself would be entirely on land on which Rosemont has undisputed mining claims. Conrad E. Huss et al., *NI 43-101 Technical Report Updated Feasibility Study*, Rosemont Copper Project: Environmental Impact Statement, 20 (Aug. 28, 2012), https://www.rosemonteis.us/sites/default/files/references/0 18958.pdf. Active mining would last between twenty and twenty-five years. The proposed mine would produce 5.88 billion pounds of copper, 194 million pounds of molybdenum, and 80 million ounces of silver.

The proposed mine would also produce 1.25 billion tons of waste rock and 660 million tons of tailings. "Waste rock" is rock that contains either no valuable minerals or minerals that would not be economical to remove. "Tailings" are rocks that remain after valuable minerals have been extracted. (For ease of reading, we refer to waste rock and tailings collectively as "waste rock.") Rosemont proposes to dump 1.9 billion tons of waste rock onto 2,447 acres of nearby National Forest land on which it has mining claims, to an average depth of 700 feet. Undisputed evidence in the administrative record shows that no valuable minerals have

been found on the mining claims that Rosemont proposes to occupy with its waste rock.

The Service issued a Draft Environmental Impact Statement ("DEIS") in 2011. The Service evaluated six alternatives, including Rosemont's proposed plan as well as one no-action alternative. The five action alternatives do "not differ significantly" in the "extent of the mineral deposit to be mined; location and size of the pit; . . . transport of ore, waste rock, and tailings; [and the] general plant site and support facility locations." Each of the five action alternatives would allow Rosemont to occupy between 2,400 and 2,900 acres of its mining claims with its waste rock. Because all five action alternatives are inconsistent with the Coronado National Forest Land and Resource Management Plan ("Forest Plan"), promulgated in 1986 under the National Forest Management Act of 1976, the Service concluded that the Forest Plan would need to be amended if one of the action alternatives were approved. *See* 16 U.S.C. § 1604(f)(4).

In the Final Environmental Impact Statement ("FEIS"), released in December 2013 at the same time as the draft record of decision, the Service selected the "Barrel Alternative," one of the five action alternatives. In June 2017, the Service issued a Record of Decision ("ROD") adopting the FEIS and approving Rosemont's MPO with minor modifications.

## B. The Service's Rationales

In its FEIS and ROD, the Forest Service relied on two grounds to support its approval of Rosemont's plan to dump 1.9 billion tons of waste rock on 2,447 acres of National Forest land. In the FEIS, the Service either assumed that

Rosemont's mining claims on that land were valid or (what amounted to the same thing) did not inquire into the validity of the claims. Based on its assumption that the mining claims were valid, the Service concluded that Rosemont's permanent occupation of the claims with its waste rock was permitted under the Mining Law. In the ROD, the Service concluded that Section 612 of the Multiple Use Act authorized Rosemont to dump its waste rock on its mining claims, whether or not the claims were valid, because the dumping would be a "use[] reasonably incident" to its mining operations.

In the FEIS, the Service assumed that Rosemont's mining claims were valid, characterizing them as conferring a "possessory interest." Valid claims confer a possessory interest; invalid claims do not. *See Cameron*, 252 U.S. at 460; *Humboldt Placer Mining Co.*, 371 U.S. at 337. Because, in the view of the Service, Rosemont's claims were valid, Part 228A regulations were the only source of its regulatory authority over Rosemont's proposed MPO. The Forest Service wrote in the FEIS:

> *Rosemont Copper owns private mineral rights and has a possessory interest for mining purposes in unpatented mining claims on the land where the project is proposed. Therefore, the company has a legal right to access minerals associated with their claims. Furthermore, the Forest Service is required to consider all proposals that meet the requirements under 36 CFR 228 Subpart A.* Forest Service regulation and policy is to allow reasonably incidental mineral operations on claims in a manner that

> minimizes adverse environmental impacts on
> NFS surface resources by imposing
> reasonable conditions that do not materially
> interfere with mineral operations (*36 CFR
> Part 228 Subpart A* and FSM 2800).

(Emphases added.)

Another part of the FEIS indicates that the Service
believed that Part 228A regulations require the Service to
allow Rosemont to dump its waste rock either on or off its
mining claims, so long as the dumping is "connected to
mining and mineral processing." In responding to a comment
during the NEPA review process asking about compliance
with the Mining Law, the Service wrote briefly:

> The placement of waste rock and mill tailings
> on the Forest are considered to be *activities
> connected to mining and mineral processing*
> as per 36 C.F.R. 228 subpart A, and as such
> they *are authorized activities regardless of
> whether they are on or off mining claims*.

(Emphases added.) The Service did not explicitly invoke
Section 612 of the Multiple Use Act in support of its response
in the FEIS, but its reliance on Section 612 in the ROD (see
the paragraph below) provides such support.

In the ROD approving the recommendation of the FEIS,
the Coronado National Forest Supervisor relied on
Section 612. The Forest Supervisor recognized the
environmental harm that Rosemont's mining operations
would cause, but concluded that the Service's authority to
regulate Rosemont's operations was limited to its authority

under the Part 228A regulations.  According to the Service, Section 612 gave Rosemont, as the owner of undisputed mining claims where its pit would be located, the right to conduct mining operations and all "uses reasonably incident thereto" on the surface of its mining claims elsewhere.  *See* 30 U.S.C. § 612(a), (b) (referring to mining operations and to "uses reasonably incident thereto").

The Forest Supervisor wrote in his ROD:

> I recognize that each of the action alternatives would result in significant environmental and social impacts and that the no action alternative is the environmentally preferable alternative . . . .  *However, Federal law provides the right for a proponent to develop the mineral resources it owns and to use the surface of its unpatented mining claims for mining and processing operations and reasonably incidental uses (*see *30 U.S.C. 612*).  Pursuant to Federal law, the Forest Service may reasonably regulate the use of the surface estate to minimize impacts to Forest Service surface resources (*see 30 U.S.C. 612 and *36 CFR 228.1*).  The analysis that is disclosed in the Rosemont Copper Project FEIS concludes that the Barrel Alternative is the alternative that best achieves the minimization of impacts to Forest Service surface resources *while allowing mineral operations and all uses reasonably incident thereto*.

(Emphases added.)

## C. This Litigation

After the Forest Service issued the ROD, Save the Scenic Santa Ritas, Arizona Mining Reform Coalition, Center for Biological Diversity, and the Grand Canyon Chapter of the Sierra Club sued the Forest Service, several Forest Service officials, and the United States.  In a separate suit, the Tohono O'odham Nation, Pascua Yaqui Tribe, and Hopi Tribe sued virtually the same parties, along with the Secretary of Agriculture.  Both suits alleged violations of the Mining Law of 1872, the Organic Act of 1897, the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA").  The Center for Biological Diversity filed another suit based on the Endangered Species Act ("ESA").  Rosemont intervened as a defendant in all three suits.  The suits were consolidated before District Judge Soto in the District of Arizona.

The Government's primary argument in the district court was based on Section 612 of the Multiple Use Act, upon which the Service had explicitly relied in its ROD and on which it had implicitly relied in its comment response in the FEIS.  The Government argued that Section 612 gives Rosemont the right to dump its waste rock on its mining claims, whether or not those claims are valid.  The Government argued in the district court:  "The use of these lands for waste rock and tailings operations was based on these necessary operations being 'reasonably incident' to Rosemont's mining operations.  *See* 30 U.S.C. § 612(a)." Federal Defendants' Motion and Memorandum in Support of Motion for Summary Judgment at 17, *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 409 F. Supp. 3d 738 (D. Ariz. 2019) (No. 4:17-cv-00475).  Relying on the statutory authority supposedly provided by Section 612, the

Government argued in its brief to the district court that Part 228A regulations support the Service's decision to approve the MPO:

> The Forest Service's Part 228, Subpart A mining regulations apply to "operations . . . conducted under the United States mining laws of May 10, 1872, as amended (30 U.S.C. § 22 *et seq*.)."  These regulations define "operations" as "[a]ll functions, work, and activities in connection with prospecting, exploration, development, mining or processing of mineral resources and all uses reasonably incident thereto, . . . *regardless of whether said operations take place on or off mining claims*."  *Id.* § 228.3(a) (emphasis added).

*Id.*

In a back-up argument in the district court, the Government denied that the Service had assumed in the FEIS that Rosemont's mining claims were valid (despite the Service having characterized the claims as conferring a "possessory" interest). *Id.* at 21.  Conceding for the sake of argument that validity of the claims was necessary, the Government argued that a "determination" of validity was not required.  According to the Government, "[N]othing in the Mining Law requires the Forest Service to regulate mining differently on mining claims that have been determined to be valid than on mining claims of unknown validity, and the Forest Service's 36 C.F.R. Part 228 Subpart A regulations are not limited to mining claims that have been determined to be valid."  *Id.* at 20.

In 2019, the district court granted summary judgment to plaintiffs in the first two suits, vacating the FEIS and ROD on the ground that the Forest Service's decision was inconsistent with the Mining Law and other federal mining statutes, with NEPA, and with the APA. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 409 F. Supp. 3d 738 (D. Ariz. 2019). The appeal from that decision is before us. The district court later granted summary judgment in part to the plaintiffs in the third suit based on the ESA, but the appeal from that decision is not before us. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 441 F. Supp. 3d 843 (D. Ariz. 2020). Two additional suits under the Clean Water Act were consolidated and stayed; neither of those suits is before us.

In the decision now before us on appeal, the district court disagreed with both grounds upon which the Service had relied in approving Rosemont's MPO. First, the court held that the Service had improperly relied on Section 612 of the Multiple Use Act in concluding that Rosemont had not only a right to conduct mining on its valid claims, but also a right to all "uses reasonably incident thereto" on its mining claims, whether or not those claims were valid. The court wrote, "Nothing within the Multiple Use Act grants an implied right to use the surface outside of a claim." *Ctr. for Biological Diversity*, 409 F. Supp. 3d at 759.

Second, the district court held that the Service had improperly assumed the validity of Rosemont's mining claims where the waste rock would be dumped. As noted above, a mining claim is valid only if valuable minerals have been found on the claim. *See* 30 U.S.C. §§ 22, 23, 26; *Cole*, 252 U.S. at 296. Because undisputed evidence in the administrative record shows that no valuable minerals have

been found on Rosemont's claims, the district court held that the Service acted arbitrarily and capriciously in assuming that the claims were valid.

The district court wrote:

> As Rosemont had unpatented mining claims covering those 2,447 acres, the Forest Service accepted, without question, that those unpatented mining claims were valid. This was a crucial error as it tainted the Forest Service's evaluation of the Rosemont Mine from the start.

*Ctr. for Biological Diversity*, 409 F. Supp. 3d at 747. The court wrote further:

> The administrative record before the Forest Service reflected that there was no location of a valuable mineral deposit underlying the unpatented mining claims covering the 2,447 acres in question; as such, the record reflected that the unpatented claims were invalid.
>
> Nonetheless, the Forest Service assumed that the claims were valid, assumed that Rosemont had the right to use those 2,447 acres to support its mining operation (i.e., by dumping 1.9 billion tons of its waste on that land), and from those assumptions attempted to minimize the environmental and cultural

impacts stemming from Rosemont's purported rights connected to their invalid unpatented mining claims.

*Id.* at 748.

The district court elaborated:

The Forest Service predicated its decision regarding Rosemont's entitlement to process ore and dump waste rock and tailings on federal land upon the validity of Rosemont's unpatented mining claims. *See* FEIS at 101 [quoted *supra*]. Under this presumption, the Forest Service believed that "Rosemont . . . has a possessory interest for mining purposes in unpatented mining claims on the land where the project is proposed." *See id.* [The district court then quoted a number of statements in the FEIS and the ROD.] These statements could accurately reflect the Mining Law of 1872 if the administrative record before the Forest Service reflected that Rosemont held valid unpatented claims in these areas.

However, the administrative record shows no basis upon which the Forest Service could find Rosemont discovered a valuable mineral deposit within the facilities, tailings, and

> waste rock areas.  In fact, the evidence in the FEIS shows the absence of any such deposit within those lands.

*Id.* at 759–60.

Concluding that the Forest Service improperly relied on Section 612 and improperly assumed the validity of Rosemont's mining claims, the district court held that the Service had acted arbitrarily and capriciously in approving Rosemont's MPO.  The Service and Rosemont timely appealed.

### III.  Standard of Review

We review de novo a district court's grant of summary judgment.  *Okanogan Highlands All. v. Williams*, 236 F.3d 468, 471 (9th Cir. 2000).

The APA requires us to set aside agency actions found to be "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).  Agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  We may not "substitute [our] judgment for that of the agency." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citation omitted).  Our review is limited to "the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015).

The Government does not argue for deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984), based on the Forest Service's approval of the project.  We do not defer under *Chevron* to agency decisions made without "a lawmaking pretense in mind," such as those made with little or no procedure or that "stop[] short of [binding] third parties."  *United States v. Mead Corp.*, 533 U.S. 218, 233 (2001); *see generally Hall v. U.S. Dep't of Agric.*, 984 F.3d 825, 835–36 (9th Cir. 2020). We "treat the precedential value of an agency action as *the* essential factor" in determining whether to apply *Chevron*. *Marmolejo-Campos v. Holder*, 558 F.3d 903, 909 (9th Cir. 2009) (en banc) (emphasis in original) (citation omitted). The Service's approval of Rosemont's MPO does not bind third parties and has no precedential value.

The Government does, however, argue that we should defer to an opinion of the Solicitor of the Department of the Interior.  *See* Solicitor's Opinion M-37057, Opinion Letter on Authorization of Reasonably Incident Mining Uses on Lands Open to the Operation of the Mining Law of 1872 ("2020 Opinion Letter") (Aug. 17, 2020).  A Solicitor's letter can warrant deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  *See McMaster v. United States*, 731 F.3d 881, 892 (9th Cir. 2013)*.*  Such documents typically merit "respect proportional to [their] 'power to persuade.'"  *Mead*, 533 U.S. at 235 (quoting *Skidmore*, 323 U.S. at 140).  Under *Skidmore*, we consider "whether the agency has applied its position with consistency," including whether "the agency's position . . . was framed for the specific purpose of aiding a party in this litigation."  *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 399–400 (2008).

We give limited weight to the 2020 Opinion Letter because, on the issue as to which the Government asks for deference, the Solicitor has taken inconsistent positions. The 2020 Opinion Letter concludes that "mining claim validity determinations are not required before allowing reasonably incident mining uses on open lands." 2020 Opinion Letter, *supra*, at 3. The Solicitor adopted this position in 2005, but had taken a different position four years earlier. *Compare* Solicitor's Opinion M-37012, Opinion Letter on Legal Requirements for Determining Mining Claim Validity Before Approving a Mining Plan of Operations (Nov. 14, 2005), *with* Solicitor's Opinion M-37004, Opinion Letter on Use of Mining Claims for Purposes Ancillary to Mineral Extraction, at 3–4, 15–16 (Jan. 18, 2001).

## IV.  Discussion

### A.  Overview

We provide detailed analysis in the next section, responding to arguments made by the Government, Rosemont, and our dissenting colleague. But the core of the analysis may be stated succinctly:

Rosemont owns valid mining rights on the National Forest land where it would dig its proposed pit mine. Mining rights on that land were given by the federal government under the Mining Law, essentially free of charge. Rosemont has now asked the Forest Service to authorize it to permanently occupy with its waste rock 2,447 acres of additional National Forest land on which it does not have valid mining rights, also essentially free of charge.

The Mining Law anticipated the very problem that Rosemont faces—finding a place to dump its waste rock. The Mining Law allows miners to establish mill sites, essentially free of charge, on nonmineral land near their mining operations.  Dumping waste rock is permissible on mill sites.  That is, the Mining Law already allows Rosemont to dump its waste rock where it makes the most sense—on land on which valuable minerals have not been discovered. However, the amount of waste rock produced by modern pit mines is much greater than can typically be accommodated on the mill site land available to a mine operator.

Because the mill site land available to Rosemont does not serve its purpose as fully or as well as the land on which it has the mining claims at issue, Rosemont's proposed solution in its MPO is to dump its waste rock on those claims.  This is a somewhat counterintuitive solution, given that Rosemont proposes to permanently occupy land that supposedly contains valuable minerals with a 700-foot layer of waste rock.  But plaintiffs do not question Rosemont's right to its proposed solution, provided its mining claims are valid.

The Forest Service approved Rosemont's MPO on two grounds.

First, the Service concluded in the ROD that Section 612 of the Multiple Use Act gives Rosemont the right to dump waste rock on its mining claims as a "use[] reasonably incident" to its mining operations, irrespective of any rights Rosemont may or may not have under the Mining Law.  The Service concluded that if Rosemont has the right under Section 612 to occupy its mining claims with its waste rock as a "reasonably incident" use, the Service's authority to regulate or forbid such occupancy would be only the limited

authority set forth in Part 228A regulations. In the district court, the Government defended the Service's rationale, arguing that Section 612 authorizes Rosemont to dump its waste rock on its mining claims as a "use[] reasonably incident" to Rosemont's mining operations. However, the Government has now abandoned its argument that the Service properly relied on Section 612.

Second, the Service assumed in the FEIS that Rosemont has valid mining claims on the land on which it proposes to dump its waste rock. Based on this assumption, the Service concluded that Rosemont has the right to occupy 2,447 acres of its mining claims with its waste rock, to an average depth of 700 feet. However, validity of a mining claim is a necessary prerequisite to post-exploration occupancy of a claim. A claim is valid only if valuable minerals have been found on the claim. It is undisputed that no valuable minerals have been found on the claims. The Service thus gave to Rosemont, essentially free of charge, the right to permanently occupy 2,447 acres of National Forest land with 1.9 billion tons of its waste rock based on an improper assumption. Contrary to the Service's assumption, Rosemont's mining claims are invalid.

As we explain below, neither Section 612 nor the Mining Law provides Rosemont with the right to dump its waste rock on thousands of acres of National Forest land on which it has no valid mining claims. We do not know whether, if the Service had understood that Section 612 does not grant rights beyond those granted by the Mining Law and that Rosemont's mining claims are invalid under the Mining Law, it would have decided that Part 228A regulations apply to Rosemont's proposal to dump its waste rock, and, if so, on what ground they are applicable. Nor do we know whether,

if the Service had found Part 228A regulations applicable notwithstanding the inapplicability of Section 612 and the invalidity of Rosemont's mining claims, it would have construed those regulations to authorize the dumping of waste rock. It is the task of the Service to make such decisions in the first instance. If and when, on remand, the Service applies Part 228A regulations to approve Rosemont's proposed occupancy of its invalid mining claims with its waste rock, we can rule on the applicability of Part 228A regulations and on the manner in which the Service has construed them. In the absence of such decisions by the Service, any ruling by our court would be premature.

## B.  Detailed Analysis

We first address Section 612 of the Multiple Use Act. We then address the Government's arguments based on the Mining Act. Finally, we address arguments based on Part 228A regulations.

### 1.  Section 612 of the Multiple Use Act

As discussed above, Section 612 of the Multiple Use Act does not authorize uses of mining claims beyond those authorized by the Mining Law. Section 612(a) forbids an owner of a mining claim to use the claim for "purposes other than prospecting, mining or processing operations and uses reasonably incident thereto." 30 U.S.C. § 612(a). Section 612(b) limits the rights of a mining claim owner by permitting third parties to use the surface of the land, so long as those uses do not "endanger or materially interfere . . . with mining or processing operations or uses reasonably incident thereto." *Id.* § 612(b).

In its appeal to us, the Government has abandoned the Service's reliance on Section 612, as well as the argument it made in the district court in support of that reliance. The Government writes in its brief to us that Section 612 "did not change the lands to which the Mining Law applied or specify where mining operations may or may not occur." Rosemont also eschews any reliance on Section 612. We agree and hold that the Service improperly relied on Section 612 to support its decision.

### 2.  The Mining Law

The Government makes several arguments under the Mining Law that we address in turn.

### a.  Section 22

In its principal argument to us, the Government proposes a new rationale based on Section 22 of the Mining Law. The Service did not rely on this rationale in approving Rosemont's MPO. Nor did the Government make this argument in the district court.

Because we can sustain an agency decision based only on "the grounds that the agency invoked when it took the action," *Michigan*, 576 U.S. at 758, we cannot sustain the Service's approval of the MPO based on the rationale now proposed by the Government. We nonetheless address the Government's newly proposed rationale in the interest of judicial efficiency, given the likelihood that on remand the Service would seek to rely on the Government's interpretation of Section 22.

The Government argues to us that Section 22 of the Mining Law gives Rosemont the right to occupy "open" Forest Service land with its waste rock, whether or not it has valid mining claims on that land.  The Government concedes in its brief to us that Rosemont will "occupy" its mining claims with its waste rock.  It argues that Section 22 gives Rosemont the right to do so, whether or not the claims are valid.   The Government writes: "Because the lands that Rosemont proposes to use for its waste rock and tailings are open, *Rosemont has a statutory right to occupy those lands*, and the Service had no reason to evaluate whether Rosemont *also* possessed valid mining claims." (First emphasis added.)

As discussed above, Section 22 is part of an integrated series of sections in the Mining Law that authorize individuals to enter onto government land, including National Forest land, to prospect for and to mine valuable minerals.  In relevant part, Section 22 reads:

> Except as otherwise provided, *all valuable mineral deposits* in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to *exploration* and purchase, and *the lands in which they are found* to *occupation* and purchase, by citizens of the United States . . . under regulations prescribed by law . . . .

30 U.S.C. § 22 (emphases added).

We begin "with the text, giving each word its ordinary, contemporary, common meaning." *Star Athletica, LLC v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1010 (2017) (quotation marks and citation omitted).  The plain meaning of Section 22

is that government lands, without restriction, shall be "free and open to *exploration* and purchase" of "valuable mineral deposits." 30 U.S.C. § 22 (emphasis added). Section 22 further provides that government lands "in which they [*i.e.*, valuable mineral deposits] are found" shall be free and open to "*occupation* and purchase." *Id.* (emphasis added). That is, the right of "occupation" depends on valuable minerals having been "found" on the land in question. *See* 30 U.S.C. §§ 23, 26. If no valuable minerals have been found on the land, Section 22 gives no right of occupation beyond the temporary occupation inherent in exploration.

The Government argues that the second clause of Section 22—"the lands in which [valuable mineral deposits] are found [are free and open] to occupation and purchase"—gives Rosemont a right to occupy National Forest land with its deposit of 1.9 billion tons of waste rock, even if valuable minerals have not been found on that land. The Government's argument is not only foreclosed by the text of Section 22. It is also foreclosed by a century of precedent. In 1919, a unanimous Supreme Court explained that Section 22 authorized temporary occupancy for the purpose of prospecting for valuable minerals, writing that "some occupation of the land ordinarily is necessary for adequate and systematic exploration" to permit "the discovery of minerals." *Union Oil*, 249 U.S. at 346. But, the Court wrote, to "create valid rights . . . a discovery of mineral is essential." *Id.*

Our court has also explained the distinction drawn in Section 22 between the right of temporary occupation for exploration purposes and the right of occupation for mining purposes after discovery of valuable minerals:

> Section 22 does not grant to citizens of the
> United States the single right to locate,
> explore and exploit mining claims on the
> public domain. The statute grants two rights,
> (1) the right to explore and purchase all
> valuable mineral deposits in lands belonging
> to the United States; and (2) the right to
> occupation and purchase of the lands in which
> valuable mineral deposits are found. The
> right to explore, that is, prospect for valuable
> minerals on public lands, cannot be telescoped
> with the right to locate the mining claim and
> occupy and exploit it for its valuable mineral
> content after such minerals have been found.

*Davis v. Nelson*, 329 F.2d 840, 844–45 (9th Cir. 1964); *see also United States v. Allen*, 578 F.2d 236, 238 (9th Cir. 1978) ("While location of a valuable mineral establishes a right to the possession of the deposit, and a surface use superior to any subsequent claimant, mere exploration, without discovery, does not confer a privilege to obstruct surface use.").

Recognizing that Rosemont will "occupy" its mining claims with its waste rock during the period of active mining, the Government argues that Section 22 permits Rosemont to occupy National Forest land with waste rock during that period because the occupancy will not be *permanent*. The Government writes:

> Plaintiffs . . . claim that the Service's decision
> effectively granted Rosemont permanent
> possession of the lands. That is wrong: after
> mining ends and reclamation is completed,

> Rosemont will no longer have the Service's authorization to occupy the surface of those lands. Certainly, the lands will be changed, but that does not preclude other meaningful uses after mining and reclamation. For instance, the mining plan provides that the waste rock and tailings area will be revegetated and may support uses like grazing, wildlife habitat, and recreation.

(Emphasis omitted.)

The Government is wrong on two counts. First, discovery of valuable minerals is essential to the right to *any* occupancy—temporary or permanent—beyond the occupancy necessary for exploration. As soon as exploration on a claim is finished, the right to continue to occupy that claim is contingent on the discovery of valuable minerals, whether or not the occupation will be permanent. Indeed, non-exploratory occupation of a valid mining claim is rarely, if ever, permanent. A right of occupancy lasts only so long as there are "valuable" minerals on the claim. That is, a right of occupancy lasts only until the claim is "worked out," or until economic forces make it no longer profitable to continue mining. *See*, *e.g.*, *Mulkern v. Hammitt*, 326 F.2d 896, 898 (9th Cir. 1964).

Second, Rosemont's occupancy with its waste rock would, in any event, be permanent. The Government and Rosemont both acknowledge that Rosemont's 1.9 billion tons of waste rock would always remain on the land. Rosemont insists that the waste rock would not be a "permanent occupation" because of the legal fiction of accretion—a concept traditionally invoked by riparian and littoral

landowners claiming ownership of natural deposits of silt, sand, and the like upon their shoreline properties. *See, e.g.*, *Doboer v. United States*, 653 F.2d 1313, 1314–15 (9th Cir. 1981). Eventually, according to Rosemont, its waste rock would be only "earth mingled with earth," and would thus not be a permanent occupation.

The argument that the proposed occupation would not be permanent does violence to the English language. Rosemont proposes to bury the existing surface of 2,447 acres of National Forest land beneath a 700-foot-deep layer of waste rock. Under any ordinary definition, the layer of waste rock will "occupy" the land on which it sits, and will do so permanently. No person or structure will ever again touch the surface of that land. Rosemont's 1.9 billion tons of waste rock will occupy that land forever, obstructing countless alternative uses. *Cf. United States v. Allen*, 578 F.2d 236, 238 (9th Cir. 1978) ("While location of a valuable mineral establishes a right to the possession of the deposit, and a surface use superior to any subsequent claimant, mere exploration, without discovery, does not confer a privilege to obstruct surface use.").

### b. Validity of Rosemont's Mining Claims

Conceding for purposes of argument that Rosemont may occupy its mining claims with its waste rock only if those claims are valid, the Government next argues that the Service has no obligation to assess the validity of the claims. The Government argues in its brief to us:

> Even assuming the Mining Law confines waste rock and tailings facilities to the four corners of a valid mining claim, the court

> erred in holding that the Service must assess the validity of Rosemont's mining claims *before* approving Rosemont's mining plan. Neither the Organic Act nor the Service's Part 228A mining regulations require the Service to undertake that analysis. The fact that those authorities refer to the Mining Law does not, as the district court reasoned, create an implicit requirement that the Service investigate a mining claim's validity before approving a mining plan on open lands. Although the Service *may* investigate the validity of mining claims in some cases, it was under no obligation to do so here, and its decision not to do so was reasonable.

(Emphases in original.)

This argument concedes that Rosemont is authorized under its current MPO to dump its waste rock on its mining claims only if those claims are valid. The regulations in Part 228A apply to "operations authorized by the United States mining laws." 36 C.F.R. § 228.1. If Rosemont's dumping of its waste rock is authorized by the Mining Law because its mining claims are valid, the Service can regulate the dumping under Part 228A regulations.

The Government insists that the Service may assume the validity of Rosemont's mining claims even where, as here, that assumption is contradicted by the evidence. We disagree. Undisputed evidence in the record shows that no valuable minerals have been found on Rosemont's claims. Because the discovery of valuable minerals is essential to the

validity of a claim, Rosemont's claims are necessarily invalid.

Indeed, not only have no valuable minerals been found, but it also appears that none are likely to be found. The record contains extensive geological evidence describing rocks that underlie the 2,447 acres, none of which contain valuable minerals. Despite this evidence, the Government insists that the Service is not required to assess the validity of Rosemont's claims. Instead, according to the Government, the Service can simply assume their validity.

The Government correctly points out that it is the BLM rather than the Service that has statutory authorization to make an *adjudicatory* determination of the validity of mining claims. *See Freeman v. U.S. Dep't of Interior*, 83 F. Supp. 3d 173, 178–79 (D.D.C. 2015) (describing the administrative process), *aff'd*, 650 F. App'x 6 (D.C. Cir. 2016). The Government asks us to defer to the 2020 Opinion Letter of the Solicitor, which concludes that "mining claim validity determinations [by the BLM] are not required before allowing reasonably incident mining uses on open lands." 2020 Opinion Letter, *supra*, at 3. As noted above, the Solicitor's 2020 Opinion Letter disagreed with a 2001 letter by the Solicitor, which diminishes the weight of the 2020 Opinion Letter.

In any event, for two reasons the Solicitor's 2020 Opinion Letter does not address the question before us. First, the Solicitor's 2020 Opinion Letter does not define "reasonably incident mining uses." It nowhere states that permanent occupancy of an invalid mining claim with a 700-foot layer of waste rock is a "reasonably incident" use. Second, and more important, a validity determination by the BLM is

irrelevant for purposes of this case. On the record before us, it is clear that Rosemont's mining claims are invalid. There is undisputed evidence showing that no valuable minerals have been found on the claims. That evidence is enough, by itself, to compel a conclusion that they are invalid.

### c. "Overstepping" by the District Court

The district court concluded not only that there is no evidence that valuable minerals have been found on Rosemont's mining claims, but also that no undiscovered valuable minerals exist on those claims. The Government argues that the district court "overstepped" in concluding that Rosemont's mining claims contain no valuable minerals.

There is extensive geological evidence in the record describing rocks on Rosemont's mining claims, and it is undisputed that no valuable minerals have been discovered on those claims. It remains possible (though unlikely) that there are undiscovered valuable minerals on the claims, and we will agree for the sake of argument that the district court overstepped in concluding that none exist. However, that is legally irrelevant. The question is whether valuable minerals have been "found" on the claims, not whether valuable minerals might be found. It is undisputed that no valuable minerals have been found. Because no valuable minerals have been found, the claims are necessarily invalid. The district court was therefore correct in holding that the Service improperly assumed their validity.

### 3. Part 228A Regulations

The Government and Rosemont argue that Part 228A regulations authorize Rosemont to occupy open federal land

with its waste rock, whether or not the land is covered by valid mining claims, because of the broad definition of "operations" in those regulations.  Our colleague makes a similar argument in her dissent.

Their arguments rely on interpretations of Sections 228.1 and 228.3(a) of Part 228A.   Section 228.1 provides in relevant part:

> It is the purpose of these regulations to set forth rules and procedures through which *use* of the surface of National Forest System lands *in connection with operations authorized by the United States mining laws* (30 U.S.C. 21–54) . . . .

36 C.F.R. § 228.1 (emphases added).  The term "operations" is defined in Section 228.3(a):

> *Operations*.    All *functions, work, and activities* in connection with prospecting, exploration, development, mining or processing of mineral resources and *all uses reasonably incident thereto*, including roads and other means of access on lands subject to regulations in this part, *regardless of whether said operations take place on or off mining claims*.

*Id.* § 228.3(a) (emphases added).

The Government and Rosemont point out that the definition of "operations" in Section 228.3(a) encompasses "all uses reasonably incident" to mining operations

"regardless of whether said operations take place *on or off* mining claims."  Based on its valid mining rights on the land where its pit would be located, Rosemont argues that Section 228.3(a) allows it to deposit its waste rock—as a "use[] reasonably incident" to mining in the pit—on National Forest land "off" its mining claims.

Our dissenting colleague makes a similar argument.  She argues that the Service's authority to regulate Rosemont's proposed dumping is governed by Part 228A because, in her view, "not every activity subject to Part 228A need be independently authorized by the Mining law."  Dissent at 64.  She reads the "in connection with" language of Section 228.1 to "broaden[] the regulatory scope of Part 228A" to include permanent occupation of invalid mining claims on National Forest land, so long as that occupation is "in connection with or related to [a] concededly valid mining operation."  *Id.* at 64, 65 (quotation marks omitted).

Both arguments are premature.  The Service relied on Part 228A regulations in its FEIS and ROD, but it did so based on Section 612 of the Multiple Use Act and on its assumption that Rosemont's mining claims are valid under the Mining Act.  The Government has now abandoned any argument based on Section 612.  Further, for reasons explained above, the Service incorrectly assumed that Rosemont's mining claims are valid under the Mining Law.  That is, neither of the statutes upon which the Service relied to support its application of Part 228A regulations to Rosemont's MPO provides such support.  Thus, the Service's approval of Rosemont's MPO is unsupported by the bases upon which the Service relied.

It is black-letter law "that an agency's action may not be upheld on grounds other than those relied on by the agency." *Nat'l R.R. Passenger Corp. v. Bos. & Me. Corp.*, 503 U.S. 407, 420 (1992).    It is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action."    *Michigan*, 576 U.S. at 758; *see also Dep't. of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) ("An agency must defend its actions based on the reasons it gave when it acted."); *State Farm*, 463 U.S. at 50 ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."); *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

We do not know whether, if the Service had understood that Section 612 gave no rights beyond those conferred by the Mining Law and that Rosemont's mining claims are invalid under the Mining Law, it would have found some other statutory basis to support the application of Part 228A regulations.  Nor do we know whether, if it were to rely on some other statutory basis, the Service would construe Part 228A regulations to authorize Rosemont's permanent occupancy of invalid mining claims with its waste rock.

In applying Part 228A regulations and relying on their own construction of those regulations to authorize Rosemont's proposed occupancy, the Government, Rosemont, and our dissenting colleague are putting the cart before the horse.  Unless and until the Service decides on remand that Part 228A regulations are applicable to Rosemont's proposed occupancy of invalid mining claims

with its waste rock, and unless and until the Service construes those regulations to permit such occupancy, any ruling by our court on these questions is premature.

## V.  Conclusion

The Forest Service acted arbitrarily and capriciously in approving Rosemont's MPO based on its misunderstanding of Section 612 of the Multiple Use Act and on its incorrect assumption that Rosemont's mining claims are valid under the Mining Law.

The Mining Law allows mining companies to occupy federal land on which valuable minerals have been found, as well as non-mineral federal land for mill sites, essentially free of charge. Rosemont wants to permanently occupy 2,447 acres of National Forest land with its waste rock, essentially free of charge, even though no valuable minerals have been found on that land and no mill sites have been established. On the current administrative record, the Service *de facto* amended the Multiple Use Act and the Mining Law to give Rosemont what it wants.

For decades, commentators have urged reform of the Mining Law. *See*, *e.g.*, Robert W. Swenson, *Legal Aspects of Mineral Resources Exploitation*, *in* Paul W. Gates, History of Public Land Law Development 699, 757 (1968) (stating that a "great many articles have appeared with suggestions which would either promote the objectives of the industry or the government" (footnotes omitted)); Leshy, *supra*, at 4–5 (noting that the law has been subject to "trenchant criticism" and that "no one defends the Mining Law in its present form"). In virtually every session of Congress, multiple competing reforms of the Mining Law are introduced.

*Compare* Hardrock Leasing and Reclamation Act, H.R. 2579, 116th Cong. (2019), *with* National Strategic and Critical Minerals Production Act, H.R. 2531, 116th Cong. (2019). But amendment of the Mining Law is a task for Congress, not for the Service, and certainly not for us.

**AFFIRMED.**

FORREST, Circuit Judge, dissenting:

Early in our history, Congress deemed it in our national interest to encourage development of the country's wealth of mineral resources, and it enacted the Mining Law in 1872 declaring public mineral lands "free and open." 30 U.S.C. § 22. For nearly a century and a half, the Mining Law has remained largely untouched. And in 1996, Congress confirmed "that it is the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in . . . [mining] to help assure satisfaction of industrial, security and environmental needs." 30 U.S.C. § 21a. While national policy concerning mining is clear, the scope of mining activities that may be performed on public lands is not.

The Mining Law itself provides sparse guidance concerning the scope and application of the rights it grants for using public lands for mining. To fill in the gaps left by Congress, the United States Forest Service (USFS) has promulgated regulations that govern surface uses of forest land related to mining. 36 C.F.R. Part 228, Subpart A. In doing so, the USFS has interpreted the Mining Law as allowing mining-related activity to occur both on lands that

contain valuable minerals and, therefore, can be claimed for mining (on-claim lands) and on lands that do not contain valuable minerals (off-claim lands). *See id.* §§ 228.1, 228.3(a). The USFS has separate regulations that govern surface uses of forest lands unrelated to mining. 36 C.F.R. Part 251, Subpart B.

This case boils down to which of the USFS's regulations govern the placement of waste rock resulting from mining onto forest land. The majority concludes that the Mining Law allows placement of waste rock only on forest land where valuable minerals are found (on-claim land) or mill sites. The majority further concludes that the USFS erroneously assumed that Rosemont's claims to the forest land where it proposed to deposit waste rock were valid and that, based on this erroneous assumption, the USFS abused its discretion in concluding that the Part 228A regulations govern this activity.

I disagree. The regulations that the USFS has adopted to fill in the gaps left by the Mining Law make two things clear: (1) the lawfulness of waste-rock disposal does not depend on whether the mine operator has valid mining claims to the disposal area, and (2) it was not arbitrary and capricious for the USFS to apply Part 228A to Rosemont's proposed deposit of waste rock because on their express terms they apply to this activity as a matter of law. Therefore, I would reverse and remand for the district court to assess the USFS's decision under Part 228A.

## I.  APPLICABLE LAW

### A.  The Law of Mining

In the late Nineteenth century, Congress enacted the Mining Law to "promote the Development of the mining Resources of the United States." 17 Stat. 91 (1872); *United States v. Coleman*, 390 U.S. 599, 602 (1968) ("Under the mining laws Congress has made public lands available to people for the purpose of mining valuable mineral deposits and not for other purposes."). Section 22 of the Mining Law provides that "all valuable mineral deposits in lands belonging to the United States . . . shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase." 30 U.S.C. § 22. The Supreme Court has held that these rights are not dependent on prior discovery of valuable minerals. *Union Oil Co. of Cal. v. Smith*, 249 U.S. 337, 346 (1919).

Under Section 26 of the Mining Law, one who locates valuable minerals on public lands has "the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodges, or ledges throughout their entire depth." 30 U.S.C. § 26. In addition to these general rights, miners may take the further step of "patenting" located mining claims, *id.* § 29, as well as mill sites—i.e., "nonmineral land not contiguous to the vein or lode" that is used for "mining or milling purposes," *id.* § 42. A patent typically conveys full title to the subject land.

*McMaster v. United States*, 731 F.3d 881, 885 (9th Cir. 2013).[1]

Over time, the broad rights to public lands granted by the Mining Act were abused. Mining claims were staked on public land to obtain timber, fishing and hunting grounds, and other non-mineral resources. *United States v. Curtis-Nev. Mines, Inc.*, 611 F.2d 1277, 1282 (9th Cir. 1980). In 1955, Congress enacted the Surface Resources and Multiple Use Act (Surface Resources Act), 30 U.S.C. §§ 611–615, to curb "abuses of the mining laws when mining claims were located with no real intent to prospect or mine but rather to gain possession of the surface resources." *Curtis-Nev. Mines, Inc.*, 611 F.2d at 1282.

Section 612(a) of the Surface Resources Act provides that an unpatented mining claim may be used only for "prospecting, mining or processing operations and uses reasonably incident thereto." 30 U.S.C. § 612(a). Section 612(b) confirms that rights conveyed by a mining claim are subject to the federal government's power "to manage and dispose of the vegetative surface resources thereof and to manage other surface resources thereof (except mineral deposits subject to location under the mining laws of the United States)." *Id.* § 612(b).

As recently as 1996, Congress reaffirmed its commitment to the development of the nation's mineral resources,

---

[1] In 1994, Congress suspended the patenting process for mining claims on federal land. Pub. L. No. 103-332 § 112, 108 Stat. 2499, 2519. This repudiation did not impact the development of unpatented mining claims. Congress's suspension of patent rights does not impact the outcome of this case.

"declar[ing] that it is the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in . . . the development of economically sound and stable domestic mining, minerals, metal and mineral reclamation industries," as well as "orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure satisfaction of industrial, security and environmental needs." 30 U.S.C. § 21a; *see also id.* § 1602 (1980) ("It is the continuing policy of the United States to promote an adequate and stable supply of materials necessary to maintain national security, economic well-being and industrial production with appropriate attention to the long-term balance between resource production, energy use, a healthy environment, natural resources conservation, and social needs.").

## B.  The Law of National Forests

Concerned about the depletion of forest resources, in 1891, Congress gave the President power to reserve forest lands from the public domain. *United States v. New Mexico*, 438 U.S. 696, 707–08 (1978). Six years later, Congress enacted the Organic Administration Act of 1897 (Organic Act), which clarified that the only permissible purposes for reserving forest land are "securing favorable conditions of water flows, and . . . furnish[ing] a continuous supply of timber for the use and necessities of citizens of the United States." 16 U.S.C. § 475; *New Mexico*, 438 U.S. at 707. Congress's motivation in creating national forests was economic, not to promote "aesthetic, environmental, recreational, or wildlife-preservation purposes." *New Mexico*, 438 U.S. at 708. The Organic Act also clarified that Congress did not intend for "lands more valuable for the mineral

therein . . . than for forest purposes" to be reserved as forest lands. 16 U.S.C. § 475.

The Secretary of Agriculture is tasked with "mak[ing] provisions for the protection against . . . depredations upon" the national forests. *Id.* § 551. The Secretary "may make such rules and regulations as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction." *Id.* But, consistent with the national policy favoring mineral development, such rules and regulations cannot "prohibit any person from entering upon such national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof." *Id.* § 478.

The Secretary conferred on the USFS—an agency within the Department of Agriculture—the authority to regulate the surface impacts of mining on national forest land. In 1974, the USFS promulgated "rules and procedures" to govern these activities. 39 Fed. Reg. 31,317 (Aug. 28, 1974); 36 C.F.R. Part 228, Subpart A. By their express terms, the Part 228A regulations apply to the "use of the surface of National Forest System lands *in connection with operations authorized by the United States mining laws* . . . so as to minimize adverse environmental impacts on National Forest System surface resources." 36 C.F.R. § 228.1 (emphasis added). These regulations do not govern the "management of mineral resources," which is a power granted to the Department of Interior; they manage only surface use of forest lands related to authorized mining activities. *Id.*[2]

---

[2] Section 228.1 clarifies that "the responsibility for managing [mineral] resources is in the Secretary of the Interior" rather than the Secretary of Agriculture. The Department of the Interior is the federal

The Part 228A regulations define mining "operations" to include "[a]ll functions, work, and activities in connection with prospecting, exploration, development, mining or processing of mineral resources and all uses reasonably incident thereto . . . regardless of whether said operations take place on or off mining claims." *Id.* § 228.3(a). Anyone wanting to conduct mining activities on forest land must submit a detailed plan of operations to the USFS. *Id.* § 228.4(a)(3), (c)–(d). The USFS must determine whether the proposed plan requires an environmental impact statement under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. 36 C.F.R. § 228.4(f); *see id.* § 228.5(a)(5). After the USFS reviews the proposed project (including conducting any environmental analysis required by NEPA), it may approve the mining plan or notify the operator of any changes needed to comply with Part 228A's environmental-protection requirements. *Id.* § 228.5(a)(1), (3); *see also id.* § 228.8 (requiring operations to be "conducted so as, where feasible, to minimize adverse environmental impacts").

Because the USFS interpreted the Mining Law as granting statutory rights to use public land for mining purposes, the Part 228A regulations do not allow the USFS to prohibit mining operations in fulfilling its mandate under the Organic Act to "make provisions for the protection against . . . depredations upon" the national forests. 16 U.S.C. § 551; *see* 36 C.F.R. § 228.5(a). The USFS clarified its interpretation of the Mining Law in a statement accompanying its adoption of the Part 228A regulations:

---

agency that adjudicates mining claims on both Bureau of Land Management-administered lands and on forest lands. *See Clouser v. Espy*, 42 F.3d 1522, 1530 n.9 (9th Cir. 1994).

> [The USFS] recognizes that prospectors and miners have a statutory right, not mere privilege, under the 1872 mining law and the Act of June 4, 1897, to go upon and use the open public domain lands of the National Forest System for the purposes of mineral exploration, development and production. Exercise of that right may not be unreasonably restricted. Specific provision has been made in the operating plan approval section of the regulations charging Forest Service administrators with the responsibility to consider the economics of operations, along with the other factors, in determining the reasonableness of the requirement for surface resource protection.

39 Fed. Reg. 31,317 (Aug. 28, 1974).

The USFS's separate Part 251 regulations govern "special uses" of forest lands. By their express terms, these regulations do not apply to surface uses that are "*authorized by the regulations governing . . . minerals* (part 228)." 36 C.F.R. § 251.50 (emphasis added). The USFS has broader regulatory authority under Part 251 than under Part 228A. The USFS will grant a special-use application submitted under Part 251 only if the proposed use complies with the applicable forest plan and "will not create an exclusive or perpetual right of use or occupancy" or "involve disposal of solid waste or disposal of radioactive or other hazardous substances" on forest lands. *Id.* § 251.54(e)(1)(ii), (iv), (ix). The USFS also must reject any proposed special use that "would not be in the public interest." *Id.* § 251.54(e)(5)(ii).

## II.  BACKGROUND

### A.  Rosemont's Proposed Mine

In 2007, Rosemont submitted a preliminary Mine Plan of Operations (MPO) to the USFS seeking approval to develop an open pit copper mine in southeastern Arizona. The preliminary MPO located the project on federal public lands within the Coronado National Forest and adjacent and intermingled state and private lands located within forest boundaries. After receiving Rosemont's MPO, the USFS published a Notice of Intent to Prepare an Environmental Impact Statement as required by NEPA. The Draft Environmental Impact Statement was published in 2011, and the Final Environmental Impact Statement (FEIS) was published two years later in 2013. In its environmental review, the USFS considered Rosemont's proposed action, four action alternatives, and a no-action alternative. *See* 40 C.F.R. § 1502.14 (requiring agencies to discuss "alternatives" in an environmental impact statement).

After a decade of review that occurred primarily during the Obama administration, the USFS issued a Record of Decision (ROD) in 2017, rejecting Rosemont's proposed action and selecting one of the action alternatives—"the Barrel Alternative."[3] The USFS explained that this alternative affects the smallest area and best protects environmental resources. Under the Barrel Alternative, Rosemont's approved mining project—the Rosemont Copper Project— will cover 5,431 acres of land and include an open pit mine, a processing plant, waste rock and tailings facilities, and

---

[3] The ROD also amended the 1986 Coronado National Forest Plan to allow Rosemont's MPO.

ancillary facilities such as access and maintenance roads and electrical and water supplies. The mine pit itself will cover 955 acres. Rosemont privately owns 590 of those acres, and it has unpatented mining claims on the remaining 365 acres of open public land.

Excavation of the mine pit will displace approximately 1.9 billion tons of waste rock and tailings. The Barrel Alternative places these waste materials on approximately 2,447 acres of open forest land to which Rosemont has unpatented mining claims. At the end of the mining project, the waste materials deposit will be approximately 700 feet deep and will remain on the surface of the forest lands in perpetuity.

The USFS imposed a variety of mitigation and reclamation measures in approving Rosemont's project, including establishment of a $25 million Santa Rita Mountains Community Endowment Trust with an additional $12.5 million in contributions to the Trust during operations and revegetation of the land where the waste rock and tailings are deposited so that it may support wildlife habitat, recreation, and grazing after the mining is completed.

## B.  Procedural History

Numerous parties filed lawsuits challenging the approval of the Rosemont Copper Project, and the district court consolidated cases sharing similar factual and legal issues. Relevant here, several environmental and conservation groups and Native American Tribes challenged the USFS's approval of the project as arbitrary and capricious under the Administrative Procedure Act (APA). Specifically, these parties (collectively, Plaintiffs) argued that the USFS

misunderstood its regulatory authority under the Organic Act, misinterpreted both the Mining Law and the Surface Resources Act, and wrongfully assumed that Rosemont's unpatented mining claims conferred a statutory right to occupy open public land. Plaintiffs also claimed that the USFS violated NEPA by failing to take a "hard look" at the alternatives to approving the Rosemont Copper Project.

The parties cross-moved for summary judgment, and the district court ruled in Plaintiffs' favor. The district court concluded that the Mining Law grants discoverers of valuable mineral deposits the right to operate only on land subject to a valid mining claim and does not confer a general right to use open public land for mining activities. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 409 F. Supp. 3d 738, 758–59, 761 (D. Ariz. 2019). It also concluded that the USFS erroneously "predicated its decision regarding Rosemont's entitlement to process ore and dump waste rock and tailings on federal land upon the validity of Rosemont's unpatented mining claims," *id.* at 759, when it had not established a "factual basis upon which [it] could form an opinion" as to the validity of Rosemont's unpatented claims, *id.* at 757, 760. Conducting its own review, the district court found that there is no evidence to support the validity of Rosemont's unpatented claims to the area where the waste rock and tailings would be deposited. *Id.* at 760–61. Therefore, it held that the USFS violated its statutory obligations in approving the Rosemont Copper Project by failing "to consider an important aspect of the problem." *Id.* at 757–63, 766 (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The district court also held that the USFS erred by applying Part 228A to the proposed waste rock deposit

because that activity is not authorized by the Mining Law and Part 228A governs only "use of the surface of National Forest lands in connection with operations *authorized* by the United States mining laws." *Id.* at 764 (quoting 36 C.F.R. § 228.1). The district court concluded that the USFS should have applied Part 251 because the Mining Law does not allow miners to deposit waste materials on off-claim land. *Id.* at 764–66. And by not applying Part 251, which prohibit the placement of solid waste on forest lands, the USFS violated NEPA by failing "to take the requisite hard look" at the alternatives that "rejected the MPO or substantially modified it as to make the mine economically unfeasible." *Id.* at 766 (citing *Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 813–14 (9th Cir. 2005)).

## III.  STANDARD OF REVIEW

"We review de novo a challenge to a final agency action decided on summary judgment and pursuant to Section 706" of the APA. *Ctr. for Biological Diversity v. Esper*, 958 F.3d 895, 903 (9th Cir. 2020). "De novo review of a district court judgment concerning a decision of an administrative agency means the court views the case from the same position as the district court," *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 973 (9th Cir. 2003), and "review[s] directly the agency's action under the Administrative Procedure Act's [] arbitrary and capricious standard," *Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1217 (9th Cir. 2015) (quotation marks omitted).

Courts must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In conducting

this review, we must "engage in a substantial inquiry[,] . . . a thorough, probing, in-depth review" of the agency action. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971)). Yet, arbitrary-and-capricious review is "highly deferential" to the agency. *Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir. 2010). Courts must "presum[e] the agency action to be valid and affirm[] the agency action if a reasonable basis exists for its decision." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007) (citation omitted). Courts must not simply substitute their judgment for that of the agency.[4] *Earth Island Inst. v. Carlton*, 626 F.3d 462, 468 (9th Cir. 2010).

## IV.  DISCUSSION

It is undisputed that the USFS has regulatory authority over Rosemont's proposed deposit of waste rock and tailings on forest land. The dispute is which regulatory scheme applies to this activity. The USFS and Rosemont contend that Part 228A governs this activity because the waste materials arise from the mining operation. The Plaintiffs contend that Part 251 applies because the Mining Law does not authorize the deposit of waste materials on off-claim land.

The majority contends that resolving which regulations apply is premature because the USFS's application of Part

---

[4] As the majority notes, the government does not argue for deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), or related deference doctrines. Therefore, it is unnecessary to address those doctrines here.

228A was based on Section 612 of the Surface Resources Act, which it has now abandoned, and on the erroneous assumption that Rosemont has valid mining claims to the land where the waste materials would be deposited. Therefore, the majority concludes that the USFS should decide in the first instance which regulatory scheme applies with the corrected understanding that Section 612 does not apply and Rosemont's relevant claims are invalid.

In my view, it is unnecessary to address Section 612 because the USFS's application of Part 228A was not dependent on Section 612 applying. And to the extent the majority asserts that the government's abandonment of Section 612 establishes that it is inapplicable as a matter of law, it misconstrues the government's briefing and runs afoul of the party-presentation principle. *See United States v. Sineneng-Smith*, __ U.S. __, 140 S. Ct. 1575, 1579 (2020) ("[I]n the first instance and on appeal, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.") (internal quotation marks and citation omitted).

Moreover, the question of which regulatory scheme applies is a legal question that depends on the express terms of the regulations, not on the issues that the majority identifies. Thus, we can and should resolve this legal interpretation question without remand to the agency. And reaching that issue, I conclude that Part 228A applies regardless of whether Rosemont has valid mining claims to the land where it seeks to deposit waste rock.

## A.

Courts decide questions of law. This is true even if the question is the meaning of a regulation enacted by an agency. *See Kisor v. Wilkie*, __ U.S. __, 139 S. Ct. 2400, 2415 (2019) (holding *Auer* deference does not apply when the meaning of a regulation can be determined as a matter of law). As the Supreme Court has instructed, "if there is only one reasonable construction of a regulation—then a court has no business deferring to any other reading." *Id.* To determine whether an ambiguity exists that necessitates a "policy-laden choice," as opposed to application of a legal interpretation, "a court must exhaust all the traditional tools of construction." *Id.* (internal quotation marks and citation omitted). For reasons explained below, the scope of Part 228A is not ambiguous and its application to Rosemont's proposed waste rock deposit can and should be decided as a matter of law.

The majority's conclusion that the USFS should decide whether Part 228A applies (with the understanding that Rosemont's claims to the deposit lands are invalid) suggests that it views this question as outside our purview to decide. The majority relies on *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), and its progeny. Ct. Op. 44–45.

*Chenery* tells us not to sustain an administrative ruling on a different ground than the agency offered. *Id.* at 87. But this rule applies to discretionary and policy-based decisions committed to the agency. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, __ U.S. __, 140 S. Ct. 1891, 1907–09 (2020) (declining to consider post hoc reasons for agency's decision to rescind the Deferred Action for Childhood Arrivals program because "[a]n agency must defend its actions based on the reasons it gave when it

acted"); *Nat. Res. Def. Council v. U.S. Env't Prot. Agency*, __ F.4th __, 2022 WL 1162310, at \*5 (9th Cir. 2022) (rejecting EPA's post hoc justification for declining to unregister a challenged pesticide because it was "not contained" in the agency's decision); *Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1068 (9th Cir. 2021) (rejecting agency's post hoc reasons for delisting the Pacific walrus as a threatened species and noting that "*a policy change* violates the APA if the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so") (emphasis added) (citation omitted).

The *Chenery* rule does not apply to purely legal issues "within the power of the appellate court to formulate." *Chenery*, 318 U.S. at 88; *see also Louis v. U.S. Dep't of Lab.*, 419 F.3d 970, 978 (9th Cir. 2005) ("*Chenery I* was premised on the policy that courts should not substitute their judgment for that of the agency when reviewing a 'determination of policy or judgment which the agency alone is authorized to make and which it has not made.'") (quoting *Chenery*, 318 U.S. at 88). Determining which regulatory scheme applies based on the language of the regulations is a legal question that courts have the power to decide. *Canonsburg Gen. Hosp. v. Burwell*, 807 F.3d 295, 304 (D.C. Cir. 2015) (*Chenery* applies only to "determinations specifically entrusted to an agency's expertise," not "legal principles" of the sort "that a court usually makes"). This is not a matter of policy or discretion—the text of a regulation "just means what it means." *Kisor*, 139 S. Ct. at 2415. Thus, there is nothing to suggest that we can or should avoid this issue, and as *Chenery* acknowledges, it is "wasteful" to do so. 318 U.S. at 88.

**B.**

I now turn to the question of which regulations govern Rosemont's proposed placement of its waste rock and tailings on national forest land. As previously outlined, Part 228A regulations govern surface uses of forest land related to mining activities. *See* 36 C.F.R. Part 228, Subpart A. Specifically, Part 228A

> set[s] forth rules and procedures through which use of the surface of National Forest System lands in connection with operations authorized by the United States mining laws (30 U.S.C. 20–54), which confer a statutory right to enter upon the public lands to search for minerals, shall be conducted so as to minimize adverse environmental impacts on National Forest System surface resources.

*Id.* § 228.1 (Section 228.1). Part 251 regulations, on the other hand, govern surface uses of forest land that are not subject to "the regulations governing . . . minerals (part 228)." *Id.* § 251.50. Thus, these regulatory schemes are mutually exclusive and the determinative question is whether disposal of waste rock from a mining operation falls within the scope of Section 228.1.

The key word in Section 228.1 is "operations" because that is what must be authorized by the Mining Law. "Operations" is defined as "[a]ll functions, work, and activities in connection with prospecting, exploration, development, mining or processing of mineral resources and all uses reasonably incident thereto . . . regardless of whether said operations take place on or off mining claims." *Id.*

§ 228.3(a). Thus, "in connection with" is used both in Section 228.1's definition of the regulatory scope of Part 228A—surface uses *in connection with* operations—and in Section 228.3(a)'s definition of "operations"—functions, work, and activities *in connection with* prospecting, exploring, developing, mining or processing mineral resources.

As a matter of plain language, "in connection with" is broad. Relevant here, "connection" means an "association or relationship." *American Heritage Dictionary of the English Language* 390 (5th ed. 2011). And the full phrase "in connection with" means "[i]n relation to; with respect to; concerning." *Id.* The Supreme Court "has often recognized that 'in connection with' can bear a 'broad interpretation.'" *Mont v. United States*, 139 S. Ct. 1826, 1832 (2019) (collecting cases). And in some contexts, the Court has recognized that it is "essentially indeterminate because connections, like relations, stop nowhere." *Id.* (quoting *Maracich v. Spears*, 570 U.S. 48, 59 (2013)).[5] And as a matter of policy, the USFS has determined that its mining regulations "should attempt to minimize or prevent, mitigate, and repair adverse environmental impacts on National Forest System surface and cultural resources as a result of lawful prospecting, exploration, mining, and mineral processing operations, *as well as activities reasonably incident thereto*." Forest Service Manual § 2817.02 (emphasis added).

---

[5] As in *Mont*, concerns about the outer limits of "in connection with" need not be grappled with here because, in context, depositing waste rock and tailings—the activity in controversy—is necessarily and directly connected with Rosemont's proposed mine.

With these interpretive guides in mind, the Part 228A regulations apply to: (1) surface use of forest lands; (2) related to; (3) all functions, work, and activities related to prospecting, exploration, development, mining or processing of mineral resources that are authorized by the Mining Law and uses reasonably incident thereto. 36 C.F.R. §§ 228.1, 228.3(a). The core prospecting, exploration, development, or processing of mineral resources must be authorized by the Mining Law, but because Section 228.1 broadened the regulatory scope of Part 228A to uses "in connection with" operations, rather than just uses that themselves qualify as operations, not every activity subject to Part 228A need be independently authorized by the Mining Law.

Turning to this case, the first element is met. Rosemont's planned deposit of organic waste materials on forest land is a surface use of the land.[6] Regarding the third element, properly framed the "operation" (or mining "functions, work, and activities") at issue is the excavation and development of the open pit copper mine. Rosemont "submit[ted] a proposed plan of operations" outlining its intent to excavate a pit mine, *id.* § 228.4(a)(3), and every aspect of its MPO furthers this

---

[6] The majority seems to suggest that the deposit of waste rock and tailings is not a surface "use" under Section 228.1 because it is a permanent occupation. Ct. Op. 40. The majority provides no legal authority for the proposition that depositing waste rock is not a "use" of land. "Use" is not specifically defined and, therefore, we give it its ordinary meaning. *See FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011). Commonly understood, "use" means "[t]o put into service or employ for a purpose." *American Heritage Dictionary of the English Language* 1907 (5th ed. 2011). The placement of materials on the surface of land is putting to service the land, and it is far from clear that where those materials are themselves taken from the land that the deposit is an "occupation," or that occupation by a thing, as opposed to a person or entity that can hold property rights, is what was contemplated by Section 22.

objective. Similar activities, such as mine "excavation, exploration, and core drilling" have been deemed "operations" under § 228.3(a). *Idaho Conservation League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1163 (D. Idaho 2012); *see also United States v. McClure*, 364 F. Supp. 2d 1183, 1185 n.5 (E.D. Cal. 2005) (noting that gold mining fell into § 228.3(a)'s "broad" definition of operation). The majority concedes that Rosemont has "valid mining rights on the land where its pit would be located," Ct. Op. 43, and it cannot reasonably be disputed that the mine itself is "authorized by the United States mining laws," 36 C.F.R. § 228.1. Thus, element three is satisfied.

The remaining question then is whether depositing waste materials removed from the mine is a surface use "in connection with" or "related to" the concededly valid mining operation—element two. The answer is yes. Processing and removing waste materials is an unavoidable part of open pit mining. *See* 1 American Law of Mining § 1.01(5)(c) (2d ed. 2021). Rosemont cannot extract its valuable mineral resources without removing and relocating organic non-mineral or waste materials. This is not a tangential activity to "development, mining or processing of mineral resources;" it is inevitable. And the logic of concluding that displacement of waste rock and tailings is not a surface use "in connection with" mining is illusive.

Thus, on its express terms Section 228.1 encompasses Rosemont's disposal of waste rock and tailings onto forest land, meaning that Part 228A governs this activity. 36 C.F.R. § 228.1. And as such, the lawfulness of this activity does not depend on whether Rosemont has valid mining claims covering the proposed disposal area. The waste-deposit activities are not the "operation" that must be authorized by

the Mining Law; it is an activity that is "in connection with" the authorized operation. *Id.* And where the regulations state that authorized operations can occur on-claim or off-claim, it necessarily follows that those activities *in connection with* such operations are likewise not claim bound. *Id.*[7]

The structure and objective of Part 228A further support interpreting these regulations as applying to Rosemont's proposed waste rock placement. *See Maracich*, 570 U.S. at 59–60. It "is standard practice in today's understanding of administrative law" that "an agency charged with administering a statute has the power to make rules 'to fill any gap left, implicitly or explicitly, by Congress.'" *Rancheria v. Jewell*, 776 F.3d 706, 712 (9th Cir. 2015) (quoting *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)). That is precisely what the USFS did when it promulgated Part 228A to implement the Organic Act in a manner consistent with the Mining Law. *See* 39 Fed. Reg. 31,317 (Aug. 28, 1974).

The USFS promulgated "rules and procedures" to ensure that activities related to mining are "conducted so as to minimize adverse environmental impacts on National Forest System surface resources." 36 C.F.R. § 228.1; *see also id.* § 228.2. The USFS recognized the necessity of environmental protection *as well as* "use of surface resources in connection with mineral operations." 39 Fed. Reg. 31,317 (Aug. 28, 1974). Not surprisingly then, Part 228A regulations explicitly impose numerous environmental-protection requirements, including reclamation standards that address, among other things, disposal of "[s]olid [w]astes," including "[a]ll tailings,

---

[7] The Forest Service Manual further supports this conclusion, stating that Part 228A applies to all "activities . . . which may be conducted under the mining laws but not on claims." Forest Service Manual § 2817.03.

dumpage, deleterious materials, or substances and other waste *produced by operations*." 36 C.F.R. § 228.8(c) (emphasis added).

The majority repeatedly omits or deemphasizes the phrase "in connection with" in referencing that Part 228A applies only to "operations authorized by the United States mining laws." *See, e.g.*, Ct. Op. 16, 39. I agree that to satisfy Section 228.1, the "operation" must be authorized by the Mining Law. But, again, the deposit of waste materials is not the relevant "operation"—it is the open pit copper mine. Not only does excavation and operation of the mine meet the definition of "operation" because it is "work . . . in connection with . . . mining or processing of mineral resources," 36 C.F.R. § 228.3(a), but treating the waste-deposit activity as the relevant operation renders superfluous the Part 228A reclamation provisions. Section 228.8(c) of these regulations provides that "[a]ll tailings, dumpage, deleterious materials, or substances and other waste *produced by operations* shall be [deposited] so as to minimize adverse impact upon the environment and forest surface resources." (emphasis added). This gives the USFS specific regulatory authority over how waste resulting from mining operations is handled. If the disposal of waste rock and tailings itself were the relevant "operation," then this section would read: "[a]ll tailings, dumpage, deleterious materials, or substances and other waste produced by [the disposal of waste rock and tailings] shall be [deposited] as to minimize adverse impact upon the environment and forest surface resources." *Id.* This makes little sense. Why specify a rule for disposing of waste materials *resulting from mining operations* if such disposal itself is an operation? *See United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) ("As our cases have noted in the past, we are hesitant to adopt an interpretation of a

[law] which renders superfluous another portion of that same law.") (citation omitted).

When "operation" is properly construed, the "*in connection with* operations" phrase becomes material. 36 C.F.R. § 228.1 (emphasis added). Had the USFS wanted the Part 228A regulations to govern only activities that are themselves "operations authorized by the United States mining laws," there would be no need for the relational phrase, "in connection with." But where this phrase was included, it must be given effect. *United States v. Nature*, 898 F.3d 1022, 1024 (9th Cir. 2018) ("We construe regulations, like statutes, to give effect to every word when possible."). The only reasonable reading is that inclusion of "in connection with" expands the application of Part 228A to more than just activities that themselves are "operations authorized by the United States mining laws."

Because a plain reading of Section 228.1 provides that Part 228A applies to the deposit of waste rock and tailings resulting from Rosemont's proposed open pit mine, it was not arbitrary and capricious for the USFS to apply these regulations when reviewing and approving Rosemont's plan. *See* 36 C.F.R. § 251.50 (explaining Part 251 regulations apply to all uses of forest land, "except those authorized by the regulations governing . . . minerals (part 228)"); *see also United States v. Hicks*, No. MCR 08-5050-M-JCL, 2009 WL 256419, at *2 (D. Mont. Jan. 9, 2009) (rejecting § 251's applicability when someone "is conducting a mining operation" because the Part 228A regulations apply and mining activities are specifically "excepted" from § 251). Requiring the USFS to apply the Part 251 regulations also undermines both the longstanding policy favoring mineral

development and its regulatory authority over mining activities.

Part 251 prohibits surface uses of forest land that involve "disposal of solid waste." 36 C.F.R. § 251.54(e)(1)(ix). Waste rock and tailings are solid waste. *See id.* § 228.8(c). Thus, seemingly *any* deposit of organic waste resulting from mining necessarily would be denied under Part 251. *See id.* § 251.54(e)(1)(iv). Moreover, limiting the deposit of waste materials to confirmed claim land means that miners must deposit waste directly on top of valuable minerals. *See* 30 U.S.C. § 23; *Cole v. Ralph*, 252 U.S. 286, 295–96 (1920). And if they do so, the deposit may still be deemed invalid because burying valuable minerals not only defies common sense, but it may invalidate the operator's otherwise valid unpatented claim. *See United States v. Coleman*, 390 U.S. 599, 602 (1968) ("[T]o qualify as 'valuable mineral deposits,' the discovered deposits must be of such a character that 'a person of ordinary prudence would be justified in the further expenditure of his labor and means . . . in developing a valuable mine.'"). All of this is contrary to federal mining policy.[8] 30 U.S.C. § 21a. And the Supreme Court has instructed that "[w]e should not lightly conclude that Congress enacted a self-defeating statute." *Quarles v. United States*, 139 S. Ct. 1872, 1879 (2019) (rejecting interpretation that would "thwart the stated goals" of the statute). Finally, it does not make sense to apply the Part 251 regulations to

---

[8] There is also some historical evidence that depositing mining-related organic waste materials on public land was accepted. *See, e.g.*, *Conway v. Fabian*, 89 P.2d 1022, 1029 (Mont. 1939) ("The owner of tailings may deposit them either upon the public domain or on lands of which he has possession."); *Esmeralda Water Co. v. Mackley*, 208 P.2d 821, 824 (Nev. 1949) ("[T]itle to tailings is not lost by their deposit upon open and unoccupied public domain.").

activity inherently connected to mining where those regulations do not impose the environmental-protection requirements contained in Part 228A that were specifically crafted to address the impact of mining activity on forest land. Indeed, the implication of such result seems to run contrary to the very interests that Plaintiffs seek to advance.

There is no doubt that the Mining Law itself leaves many ambiguities, including where mining waste can be deposited. There is also no doubt that the Mining Law has been widely criticized, understandably so, and that Congress has failed to act. But the USFS has taken steps to fill the gaps left by Congress by promulgating formal regulations and developing policies based on its interpretation of the Mining Law and other relevant statutes. Here, Plaintiffs challenge the *application* of Part 228A to Rosemont's proposed deposit of waste rock and tailings on forest land, but they do not challenge the *substance* of Part 228A or USFS's authority to promulgate these regulations. With no such challenges, this court has no occasion to address these issues, only to apply the regulations as written.

## V.  CONCLUSION

Because I conclude that Part 228A applies as a matter of law to Rosemont's proposed placement of waste rock and tailings resulting from its open pit mine onto open forest lands and that the district court erred in concluding that the USFS acted arbitrarily and capriciously in applying Part 228A in its approval of these activities, I would reverse the district court's decision. The question remains, however, whether the USFS's approval of the Barrel Alternative was proper under Part 228A because the district court failed to assess the agency's decision under these regulations.

Therefore, I would remand for the district court to review the USFS's decision under the proper regulatory scheme in the first instance.

I respectfully dissent.